| | |
|---|---|
| MESA COUNTY DISTRICT COURT<br>Mesa County Justice Center<br>125 N Spruce St.<br>P.O. Box 20,000-5030<br>Grand Junction, CO 81501 | DATE FILED: December 10, 2019 4:32 PM<br>FILING ID: BBE86DD1788D0<br>CASE NUMBER: 2019CV30508 |
| **Plaintiff:** MARY DORING<br><br>**v.**<br><br>**Defendants:** DUANE HARTSHORN, MD and APYX MEDICAL CORPORATION | ▲COURT USE ONLY▲ |
| Attorney for Plaintiff:<br>Sam D. Starritt, No. 27876<br>DUFFORD WALDECK MILBURN & KROHN LLP<br>744 Horizon Court, Ste. 300<br>Grand Junction, CO 81506<br>Phone Number: (970) 241-5500<br>FAX Number: (970) 243-7738<br>E-mail: starritt@dwmk.com | Case Number:<br><br>Division:<br><br>Courtroom: |
| **COMPLAINT** ||

Plaintiff, Mary Doring, by and through undersigned counsel, brings the following Complaint:

### I. PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Mary Doring is a resident of the State of Colorado.

2.  Defendant Duane Hartshorn, MD was, at all relevant times, a physician licensed to practice medicine in Colorado, holding himself out as a facial plastic surgeon with expertise in facial skin resurfacing using the Renuvion J-Plasma device.

3.  Defendant Apyx Medical Corporation f/k/a Bovie Medical Corporation ("Apyx") is a Florida corporation with a principal address of 5115 Ulmerton Road, Clearwater, Florida, 33760.

**Exhibit A**

4. This Court has personal and subject matter jurisdiction over this action pursuant to C.R.S. § 13-1-124(1)(a), (b), and (c).

5. Venue is proper pursuant to C.R.C.P. 98(c).

## II. GENERAL ALLEGATIONS

6. Bovie Medical Corporation, n/k/a Apyx Medical Corporation, developed a device it called "Bovie J-Plasma" for the delivery of radiofrequency energy and/or helium gas plasma to cut, coagulate and ablate soft tissue during open and laparoscopic procedures.

7. On August 16, 2016, Bovie Medical Corporation registered a trademark for "Renuvion," a brand name for electrosurgery devices for use in general surgery and plastic surgery procedures.

8. Upon information and belief, Bovie Medical Corporation began marketing the off-label use of the J-Plasma device for dermal (skin) resurfacing in 2016.

9. The term "off label use" means using a device approved by the Food and Drug Administration (FDA) for an unapproved use.

10. The J-Plasma device had not been approved by the FDA for dermal resurfacing, including dermal resurfacing of the face.

11. Indeed, at that time there were no studies in human beings demonstrating the safety of J-Plasma for facial skin resurfacing.

12. Nevertheless, at least as early as 2016, Defendants Hartshorn and his cosmetic plastic surgery practice, Regenesis Plastic Surgery, had acquired a J-Plasma device and had begun marketing facial skin resurfacing with the J-Plasma device to the public.

13. Upon information and belief, Defendant Hartshorn had no expertise to evaluate the safety of J-Plasma for dermal, or skin, resurfacing.

14. On January 10, 2017, Bovie submitted an application for premarket notification 510(k) for its J-Plasma devices; the application made no mention of the use of the devices for dermal resurfacing.

15. After seeing the television advertisement, Mrs. Doring consulted Defendant Hartshorn on November 6, 2017, regarding various issues, including possible treatment of fine lines and wrinkles on her face with J-Plasma or CO2 laser.

16. Defendant Hartshorn discussed both CO2 laser treatment and J-Plasma treatment of her face, telling her that J-Plasma was safer than laser, as lasers can burn, and J-Plasma does not burn.

17. On January 22, 2018, Defendant Apyx started a study with the objective of demonstrating "the safety and efficacy of the J-Plasma system for use in dermal skin resurfacing." The study was expected to take 9-12 months to complete.

18. The study enrolled its final patient in May 2018.

19. On August 30, 2018, Bovie Medical sold its core business of Bovie electrocautery devices to Symmetry Surgical, as the company pivoted to the lucrative cosmetic surgery market.

20. Following the sale, Bovie planned to re-brand itself as Renuvion, expecting to earn $85 million dollars from dermal skin resurfacing procedures, assuming 200,000 annual procedures at $425 list price for each handpiece.

21. Bovie/Renuvion's U.S. commercial strategy was to market and sell Renuvion to "early adopters" in the U.S. cosmetic market using 19 field-based sales professionals and 11 independent sales agencies

22. On August 1, 2018, Defendant Apyx issued a press release quoting its Chief Executive Officer, Charlie Goodwin, as saying that the results from the dermal resurfacing study "will support our 510(k) submission to the FDA for a new indication to market and sell Renuvion for dermal resurfacing procedures." The study was not yet complete.

23. After an unrelated procedure on her nose in April 2018, Mrs. Doring consulted Defendant Hartshorn on September 20, 2018, to schedule a J-Plasma procedure on her face.

24. Defendant Hartshorn again assured her the J-plasma dermal resurfacing procedure was safe, and that it would smooth out the skin on her face, take care of some brown spots and that the post-operative healing course would take three to four weeks, after which time she would have a little redness which could be covered with makeup until fully healed.

25. Mrs. Doring specifically asked about complications and problems with the J-Plasma procedure; Defendant Hartshorn stated the only issue he had heard of was one of his partner's patients in Ridgway who experienced a problem with her eyes. Defendant Hartshorn stated that after prescribing some eyedrops the problem resolved.

26. Based on Defendant Hartshorn's assurances, Mrs. Doring decided to go forward with the J-Plasma facial resurfacing procedure.

27. Defendant Hartshorn performed the J-Plasma procedure on Mrs. Doring under general anesthesia on October 16, 2018, at Grand Valley Surgical Center.

28. Defendant Harthshorn's operative report states that "using a J-Plasma wand at settings of 40 and 4," he performed "J-Plasma over the face from hairline to jawline and from the tragus to tragus also including the ear lobule. At the jawline, I went 2 to 3 passes each with 30 and 4, 20 and 4 and 10 and 4. I then went around her eyes at 20 and 4." After wiping off the treated skin he then "made a second pass at 40 and 4 over the entire face with the exception of the eyes, which had a second pass of 20 and 4 and again I tapered it into the neck at 30, 20, 10 for 2 to3 passes each."

29. After coming out of anesthesia Mrs. Doring was in significant pain. Her face was oozing, painful and crusty, as the photograph below reflects:



30. On October 22, 2018, Mrs. Doring texted Defendant Hartshorn's CNA, Stephanie Ross, as she had run out of silver gel to put on her face.

31. On October 23, 2018, Mrs. Doring returned to Defendant Hartshorn's office at ReGenesis for a post-operative visit, at which time she was seen by Stephanie Ross, CNA, who noted in the chart that Mrs. Doring "looks very good today."

32. On October 24, 2018, Mrs. Doring developed several painful, bleeding lacerations on her eyelids due to the crustiness. She texted CNA Ross about the development and Ms. Ross asked Mrs. Doring to send her photographs of her eyes, which she did.

33. Ms. Ross texted back that the "bleeding around [those areas on the eyelids] is normal as long as it's not excessive. It is normal for your eyes to feel very sensitive after Jay [sic] plasma."

34. On October 30, 2018, Defendant Apyx registered the Renuvion® trademark. Thereafter Defendant Apyx began marketing and selling J-Plasma devices under the brand name Renuvion Cosmetic Technology.

35. The evening of October 31, 2018, Dr. Hartshorn called Mrs. Doring, telling her he had looked at the photographs taken by Ms. Ross and that everything looked as it should and the bleeding was normal.

36. Mrs. Doring's face continued to worsen:



37. On November 6, 2018, Mrs. Doring returned to ReGenesis and was again seen by CNA Ross at ReGenesis:

5



38. On November 16, 2018, at 8:10 a.m., Mrs. Doring texted Ms. Ross: "Can you please call me. I am concerned." After Ms. Ross and Mrs. Doring spoke, Ms. Ross spoke with Defendant Hartshorn's partner, Jeffrey Pitcher, MD, who prescribed Bactrim. Mrs. Doring asked if it would be possible for Dr. Pitcher to see her that day. Ms. Ross said that he was not available, and that a Monday appointment (November 19th) would be fine.

39. On November 19, 2018, Mrs. Doring saw Dr. Pitcher, who noted areas of her face were "still very raw and red. The tissue around the eyes is pulling down from the tightening of the tissue." He instructed her to continue the same skin care regimen and massage the skin under her eyes.

40. That Thanksgiving was painful, as Mrs. Doring's face continued to ooze, bleed and crust over.

41. On November 26, 2018, Defendant Hartshorn saw Mrs. Doring for the first time since the J-Plasma procedure.

42. Defendant Hartshorn told Mrs. Doring he did not know why she was "healing so slowly."

43. Mrs. Doring asked if this had happened to anyone else; Defendant Hartshorn responded that he had had two other J-Plasma patients who had healed very

6

slowly. In her medical record Defendant Hartshorn stated he saw no evidence of infection, and he reassured Mrs. Doring that she would heal without excessive scarring.

44. Mrs. Doring returned to see Defendant Hartshorn on December 3, 2018. She asked him why she was not healing; he said that she was healing, just very slowly. Defendant Hartshorn had few answers for Mrs. Doring at the next visit on December 10, 2018.

45. On December 12, 2018, Mrs. Doring consulted an ophthalmologist regarding her damaged lower eye lids, sensation of foreign bodies in her eyes, green discharge and burning. He noted severe ectropion (pouching outward of the lower lid so that it does not adequately cover the eyeball, which dries out and gets irritated). He prescribed treatment.

46. On December 18, 2018, Defendant Apyx filed a premarket notification 510(k) for regulatory clearance for a new clinical indication to market and sell Renuvion Cosmetic Technology (the J-Plasma devices) for dermal resurfacing procedures.

47. Mrs. Doring returned to see Dr. Hartshorn on December 17, 2018, and January 2, 2019; at each visit Dr. Hartshorn told her healing was gradual and progressive, and he urged her to continue follow up with his office. Her face did not appear to her to be "healing:"



48. On January 7, 2019, Defendant Apyx announced its preliminary financial results for the fourth quarter 2018, quoting its President and CEO, Mr. Goodwin as stating "Our strategic focus has resulted in Advanced Energy sales growth of more than 72% in 2018 . . . We have a strong balance sheet and a focused plan to encourage broad-based adoption of Renuvion, which we believe ultimately achieves strong, sustained and profitable growth for the benefit of our stockholders."

49. On January 10, 2019, Mrs. Doring obtained a second opinion from a dermatologist; the dermatologist noted severe erythema and oozing with yellow discharge and crusting to her face. The dermatologist cultured the wounds and diagnosed Plaintiff with burn and impetigo.

50. Defendant Hartshorn had never cultured the non-healing areas on Mrs. Doring's face.

51. Plaintiff's wound cultures came back positive for infection with pseudomonas. The dermatologist prescribed antibiotics to cover the bacteria.

8

52. In February 2019, White Diamond Research released a report alleging, among other things, that a clinical study on the use of J-Plasma for dermal resurfacing may have missed its endpoints.

53. On April 1, 2019, Defendant Apyx notified the public that it had withdrawn its application for premarket notification 510(k) regulatory clearance of J-Plasma/ Renuvion for use in dermal resurfacing procedures.

54. In April 2019 Mrs. Doring traveled to Denver to consult specialists at the University of Colorado. These specialists fitted her with masks she must wear daily to treat the scars:





52. In February 2019, White Diamond Research released a report alleging, among other things, that a clinical study on the use of J-Plasma for dermal resurfacing may have missed its endpoints.

53. On April 1, 2019, Defendant Apyx notified the public that it had withdrawn its application for premarket notification 510(k) regulatory clearance of J-Plasma/ Renuvion for use in dermal resurfacing procedures.

54. In April 2019 Mrs. Doring traveled to Denver to consult specialists at the University of Colorado. These specialists fitted her with masks she must wear daily to treat the scars:





55. As a result of Defendant Apyx's marketing and sale of the J-Plasma devices for the off-label purpose for dermal resurfacing, i.e., use of the J-Plasma device for purposes not approved by the FDA, to Defendant Hartshorn, Mrs. Doring suffered excruciating pain, emotional distress, humiliation, inconvenience, impairment of the quality of her life, disfigurement, physical impairment, and past and future expense for treatment and household services.

56. As a result of Defendant Hartshorn's negligent treatment of Mrs. Doring during the J-Plasma procedure and thereafter, Mrs. Doring has suffered excruciating pain, emotional distress, humiliation, inconvenience, impairment of the quality of her life, disfigurement, physical impairment, and past and future expense for treatment and household services.

### III.  FIRST CLAIM FOR RELIEF
(Medical negligence – Defendant Hartshorn)

57. Plaintiff incorporates by reference all previous paragraphs as if fully set forth.

58. October 16, 2018, Defendant Hartshorn performed dermal resurfacing of Mrs. Doring's face to treat fine lines and wrinkles using Defendant Apyx's J-Plasma device.

59. Upon information and belief, Defendant Hartshorn was aware before October 16, 2018, that use of the J-Plasma device for dermal resurfacing was an off-label use that had not been approved by the FDA.

60. Upon information and belief, Defendant Hartshorn was aware before October 16, 2018, that no studies had demonstrated the safety of the J-Plasma device for dermal resurfacing in human beings.

61. Upon information and belief, Defendant Hartshorn lacked sufficient education, training and experience in the use of the J-Plasma device to safely treat patients, including Mrs. Doring, for dermal resurfacing.

62. With respect to his care and treatment of the Mrs. Doring, Defendant Hartshorn owed a duty to exercise that degree of care, skill, caution, diligence and foresight exercised by and expected of physicians treating the same or similar conditions.

63. Defendant Hartshorn deviated from that standard and was negligent by using a device which had not been demonstrated to be safe for dermal resurfacing, by performing a J-Plasma procedure for which he had not been adequately trained, by too aggressively applying energy to Mrs. Doring's face, and by failing to recognize and treat an infection in the post-operative period.

64. As a direct and proximate result of the negligence of Defendant Hartshorn, Plaintiff has suffered permanent injury, dysfunction, physical impairment and disfigurement of her face; pain and suffering, inconvenience, emotional distress, and mental anguish. Plaintiff seeks past, present and future economic damages for medical, surgical, therapeutic, and other health care expenses; cost of travel to and from medical visits; loss of household services; together with economic losses Plaintiff may incur in the future as a result of her disfigurement, dysfunction and pain.

## IV.  SECOND CLAIM FOR RELIEF
(Product Liability – Defendant Apyx)

65. Plaintiff incorporates all previous paragraphs as if fully set forth.

66. Defendant Apyx, previously known as Bovie Medical Corporation, manufactured the J-Plasma device which was used by Defendant Hartshorn to perform dermal resurfacing on Mrs. Doring on October 16, 2018.

67. Defendant Apyx, previously known as Bovie Medical Corporation, marketed the J-Plasma device to Defendant Hartshorn and/or Regenesis Plastic Surgery for the off-label use of dermal resurfacing.

68. Defendant Apyx, previously known as Bovie Medical Corporation, sold the J-Plasma device to Defendant Hartshorn and/or Regenesis Plastic Surgery in Grand Junction, Colorado.

69. Upon information and belief, Defendant Apyx, previously known as Bovie Medical Corporation, failed to provide appropriate training and guidance to Defendant Hartshorn in the safe use of the J-Plasma device for dermal resurfacing.

70. Defendant Apyx, previously known as Bovie Medical Corporation, prioritized profits in the cosmetic surgery market by marketing its J-Plasma device for dermal resurfacing, an off-label use, over the safety of patients on whom the device would be used, by marketing the device before its safety had been demonstrated and without providing guidelines and procedures for cosmetic surgeons to assure the safety of patients on whom the device was used.

71. Defendant Apyx's CEO Charlie Goodwin stated in a March 12, 2018, press release that the company had achieved 20% revenue growth in 2017 "driven by impressive sales of our J-Plasma technology in the cosmetic surgery market," demonstrating Defendant Apyx's goal to maximize revenue despite the lack of valid scientific studies affirming the safety of the device for dermal resurfacing in humans.

72. Defendant Apyx was negligent by failing to exercise reasonable care to prevent the J-Plasma device from creating an unreasonable risk of harm in patients who might reasonably be expected to be affected by the device while it was being used in a manner Defendant Apyx might have reasonably expected, such as dermal resurfacing.

73. Mrs. Doring was one of those persons Defendant Apyx should have reasonably expected would be affected by use of the J-Plasma device for dermal resurfacing.

74. Mrs. Doring suffered injuries, damages and losses that were caused by Defendant Apyx's negligence, while the J-Plasma device was being used in a manner by Defendant Hartshorn that Apyx should have reasonably expected given its aggressive marketing of the device for dermal resurfacing.

75. Defendant Apyx should have warned physicians of the risk of harm that could be caused by the J-Plasma device; however, Defendant Apyx failed to use reasonable care to warn of the risk of harm or injury due from the off-label use of the J-Plasma device for dermal resurfacing.

76. As a result of Apyx's failure to properly warn Defendant Hartshorn of the risk of injury and harm to patients from the off-label use of the J-Plasma device, Plaintiff suffered injuries, damages and losses as more fully described above.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

## *CERTIFICATE OF REVIEW*

Pursuant to C.R.S. § 13-20-602(3)(a), counsel certifies as follows:

a. Counsel has consulted with licensed professionals with expertise in the areas of the alleged negligent conduct as set forth in Plaintiff's Complaint; and

b. The licensed professionals who have been consulted have reviewed all

   known facts relevant to the allegations of negligent conduct as complained of in Plaintiff's Complaint;

c. Based upon such facts, the licensed professionals have concluded that the filing of the claims against the Defendants do not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); and,

d. The licensed professionals who have reviewed all known facts relevant to the allegations of negligent conduct as contained in Plaintiff's Complaint meet the requirements set forth in C.R.S. § 13-64-401.

Respectfully submitted this 9th day of December, 2019.

           **DUFFORD, WALDECK, MILBURN & KROHN, LLP**

      By: *s/ Sam D. Starritt*
         Sam D. Starritt, # 27876
         744 Horizon Court, Ste. 300
         Grand Junction, CO 81506
         Phone Number: (970) 241-5500
         FAX Number: (970) 243-7738
         E-mail: starritt@dwmk.com

Plaintiff's address:
2632 Chestnut Drive
Grand Junction, CO 81506